IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ULTRATEC, INC. and CAPTEL, INC.,

                Plaintiffs,

v.                                                         OPINION & ORDER

SORENSON COMMUNICATIONS, INC. and                 14-cv-66-jdp
CAPTIONCALL, LLC,

                Defendants.

---

Plaintiffs Ultratec, Inc. and CapTel, Inc. asserted U.S. Patent No. 7,660,398 (the '398 patent) against defendants Sorenson Communications, Inc. and CaptionCall, LLC. Defendants stipulated to infringement, Dkt. 602, at 3:11-4:20, and the case went to trial on validity and damages. The jury found that the asserted claims were not obvious, Dkt. 564, and it awarded damages of $5,443,484.61 for infringement, Dkt. 575. The court entered judgment on October 15, 2016. Dkt. 580.

Post-trial motions from both sides are now before the court. Plaintiffs ask to seal portions of the trial transcript to protect competitively sensitive information. Dkt. 616. The court will grant this motion. Plaintiffs also have submitted a bill of costs, Dkt. 591, and they seek a permanent injunction or an enhanced ongoing royalty, Dkt. 609, an award of supplemental damages, pre-judgment interest, post-judgment interest, and an accounting of defendants' minutes of use, Dkt. 612. These are reasonable requests from a prevailing plaintiff that the court would likely grant, at least in part. But the court will deny these requests, because the court will grant defendants' motion for judgment as a matter of law that the '398 patent is invalid as obvious. Dkt. 606. Defendants also move for judgment as a matter of law on damages. Dkt. 605. Although this motion could be regarded as moot, the

court will deny it on the merits because doing so will allow the issue to be addressed on appeal.

## BACKGROUND

The court will not repeat here the general background to the '398 patent, which is set out in the court's decision on summary judgment. Dkt. 478.

One development after that decision is important to the damages issue, because it affects the number of captioned calls that infringe the '398 patent. After summary judgment, the court clarified its decision to give the claim term "cancel the voice of the assisted user from the second telephone line so that the relay does not hear the voice of the assisted user, so the relay can caption all the words on the second telephone line" its plain meaning. Dkt. 507. At trial, the court instructed the jury that the "claim limitation is satisfied so long as a call assistant with normal hearing would not hear the words spoken by the assisted user while captioning a call." Dkt. 567, at 8.

Another development affects the invalidity issue. The court determined during trial that the one-line CapTel trials were a commercial use of that technology, and thus the one-line CapTel trials are prior art to the '398 patent.

## ANALYSIS

**A. Defendants' motions on validity and damages**

Defendants move for judgment as a matter of law under Federal Rule of Civil Procedure 50 and for a new trial under Rule 59.[1] They contend that the patent is invalid as

---

[1] Defendants moved for judgment during trial, Dkt. 550 and Dkt. 572, and they have

obvious, Dkt. 606, and that the basis for plaintiffs' damages calculations is speculative, Dkt. 605.

The standards applicable to these motions are not matters unique to patent law, so the court applies the law of its regional circuit. *ABT Sys., LLC v. Emerson Elec. Co.*, 797 F.3d 1350, 1354 (Fed. Cir. 2015). "In deciding a Rule 50 motion, the court construes the evidence strictly in favor of the party who prevailed before the jury and examines the evidence only to determine whether the jury's verdict could reasonably be based on that evidence." *Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012). The court reviews the entire record but does not reweigh the evidence, make credibility determinations, or consider evidence favorable to the moving party that the jury was not required to believe. *Id.* Thus, defendants are entitled to judgment as a matter of law only if the jury did not have a "legally sufficient evidentiary basis" to find in plaintiffs' favor. *Id.*; Fed. R. Civ. P. 50(a)(1).

A new trial is appropriate under Rule 59 "if the verdict is against the weight of the evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party." *Tapia v. City of Greenwood*, 965 F.2d 336, 338 (7th Cir. 1992). Likewise, a motion to amend the judgment under Rule 59(e) "will be successful only where the movant clearly establishes: '(1) that the court committed a manifest error of law or fact, or (2) that newly discovered evidence precluded entry of judgment.'" *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 954 (7th Cir. 2013) (quoting *Blue v. Hartford Life & Accident Ins. Co.*, 698 F.3d 587, 598 (7th Cir. 2012)). "A 'manifest error' is not demonstrated by the disappointment of the losing party. It is the 'wholesale disregard, misapplication, or failure to recognize controlling

---

renewed those motions after trial.

precedent.'" *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (quoting *Sedrak v. Callahan*, 987 F. Supp. 1063, 1069 (N.D. Ill. 1997)).

### 1. Validity

Defendants move for judgment as a matter of law that the '398 patent is invalid as obvious. Dkt. 606.

The standard applicable to determining patent validity is governed by Federal Circuit law. *ABT Sys.*, 797 F.3d at 1354. A patent is invalid if a person of ordinary skill in the art would have found the invention obvious in light of the prior art at the time of the filing date. 35 U.S.C. § 103. Defendants "must 'demonstrate by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'" *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012) (quoting *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009)).

Obviousness is ultimately a question of law, based on underlying facts. *Ohio Willow Wood Co. v. Alps S., LLC,* 735 F.3d 1333, 1343 (Fed. Cir. 2013). The inquiry is guided by the familiar *Graham* factors: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the prior art and the claims at issue; and (4) the objective indicia of non-obviousness. *Id.* After a jury verdict on the issue of obviousness, the court will review the jury's explicit and implicit factual findings for substantial evidence. Then the court will consider the legal conclusion of obviousness in light of the factual findings that are adequately supported. *ABT Sys.*, 797 F.3d at 1354.

a. **Scope and content of prior art**

In this case, defendants presented five pieces of prior art: U.S. Patent Publication No. 2002/0085685 to Engelke et al. (the '685 publication), U.S. Patent No. 6,504,910 to Engelke et al. (the '910 patent), U.S. Patent No. 6,141,415 to Tandhoni S. Rao (the Rao patent), a textbook titled Advanced Signal Processing and Noise Reduction by Saeed V. Vaseghi (the Vaseghi reference), and the CapTel trials.

The parties had only immaterial disputes about the content of the prior art. Plaintiffs contend that the '910 patent does not disclose a two-line captioned telephone. But this position is belied by the text of the specification, which has a full paragraph discussing a two-line arrangement. 7:22-46.

In defendants' reply brief, they contend that the obviousness of the '398 patent is demonstrated with a single combination: the '685 publication with the CapTel trials. The court agrees that this combination is sufficient, and, accordingly, its analysis here will focus on those two pieces of prior art. The other references, especially the Rao patent and the Vaseghi reference, demonstrate that echo cancellation and other noise-cancelling technologies were widely known and available to one of skill in the art. The other references would be helpful to the obviousness case, but they are not necessary.

The '685 publication discloses a two-line caption telephone arrangement in which a call assistant revoices the words of the remote user to a text-recognition device so the assisted user can see the captions in nearly real time. In the two-line arrangement, the assisted user is connected by one phone line directly to the remote user, and by another connection to the call assistant. '685 publication, ¶ 39.

The CapTel trials involved a one-line caption telephone system in which the assisted user has a single telephone line that connects to the call assistant, and the call assistant then connects to the remote user. Dkt. 597, Tr. 4a, at 99:3-14 (the CapTel trials essentially used the technology described in the '910 patent).[2] Critically, the CapTel trials used echo cancellation to cancel the voice of the assisted user so that the call assistant hears only the voice of the remote user. This allows the call assistant to caption all of the words he hears, without having to distinguish between the voice of the remote user (which must be transcribed to captions) and the voice of the assisted user (which should not be transcribed).

### b. Level of ordinary skill in the art

The court decided before trial that the field of the invention was "telecommunication technology for the deaf and hard-of-hearing." Defendants had contended that the field of the invention should have been broader, but for purposes of their motion they accept the court's definition.

Neither party has raised any disputed issue concerning the level of ordinary skill in the field of invention. The court will accept the testimony of plaintiffs' expert, Dr. Paul Ludwick, that a person of ordinary skill in the art would have post-secondary education in electronic circuitry, electrical engineering, computer science, or computer information systems; a high-level familiarity with the use of digital signal processors and voice telephone; and at least a basic familiarity with the telecommunication needs of the deaf and hard-of-hearing. Dkt. 597, Tr. 4a, at 84:2-85:6.

---

[2] Citations to trial transcripts are by docket entry, day and session, page, and line. Thus, "Dkt. 597, Tr. 4a, at 99:3-14" refers to the transcript from the fourth day of trial, morning session, page 99, lines 3 through 14, located on the docket at entry 597.

### c. Differences between the prior art and the claims at issue

At its heart, claim 11 of the '398 patent claims a two-line captioned telephone that uses echo cancellation to prevent the voice of the assisted user from reaching the call assistant. The '685 publication discloses the two-line arrangement; the CapTel trials disclose the use of echo cancellation on the voice of the assisted user. There are two differences between the prior art and claim 11. First, in claim 11, the echo cancellation mechanism is part of the phone, whereas in the CapTel trials, echo cancellation was performed at the relay. Second, claim 11 combines the two-line arrangement with the use of echo cancellation.

The court starts with the combination issue. The question here is whether one of skill in the art would combine the CapTel trials and the '685 publication. The motivation to combine is readily apparent. The use of echo cancellation provides the benefits of faster and more accurate captioning. It also provides increased privacy, because the words of the assisted user are not heard by the call assistant. The two-line system provides the benefit of direct of calls to and from the assisted user. Direct dialing makes initiating the call easier, and it allows the remote user to see the assisted user's caller ID. It also allows the assisted user to make 911 calls that will correctly show the assisted user's location. The two-line configuration also allows the assisted user to turn captioning on and off as needed.

All of these benefits are steps in the direction of "functional equivalence" to a traditional voice telephone service, which is the stated goal of the federal program requiring telephone services for the deaf and hard-of-hearing. Dkt. 585, Tr. 5a, at 135:10-25. One of skill in the art in the field of telecommunications for the deaf and hard-of-hearing would quite naturally try to combine the benefits of the two-line system with those of echo cancellation to move closer to functional equivalence. This is an example of a combination of

elements—all available within the precise field of the invention—that is no "more than the predictable use of prior art elements according to their established functions." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007).

The court turns to the second difference: that in the '398 patent the echo cancellation mechanism is in the phone, not at the relay. Plaintiffs argue that the one-line CapTel trials teach *only* the use of echo cancellation at the relay, and that the CapTel trials teach away from the combination because echo cancellation at the relay would not work in a two-line configuration. The court is not persuaded.

The testimony by Dr. Ludwick cited by plaintiffs to establish that echo cancellation at the relay would not work in a two-line system is merely conclusory. Dr. Ludwick simply stated that there is no motivation to combine because one-line and two-line systems contain incompatible architecture. Dkt. 597, Tr. 4a, at 115:19-22. He did not actually testify that it would not work. Plaintiffs do not point to any express "teaching away" in the CapTel trials that would actually discourage one of skill in the art to consider the combination of echo cancellation with a two-line configuration.

The evidence at trial was clear on one related point, however: locating the echo cancellation mechanism in the captioned telephone was the obviously superior design decision. The echo cancellation mechanism uses a reference signal consisting of the assisted user's voice. Echo cancellation performance will be better if that reference signal is cleaner, so it makes sense to put the echo cancellation mechanism near the source of the reference signal, which is to say, in the captioned telephone itself. Both sides' experts agreed on this point. *See* Dkt. 595, Tr. 2a, at 73:3-77:5 (defendants' expert); Dkt. 585, Tr. 5a, at 62:4-12 (plaintiffs' expert); *see also* Dkt. 596, Tr. 3a, at 64:10-65:2; Dkt. 597, Tr. 4a, at 19:5-22:2.

8

Whether a person of skill in the art would have been motivated to combine or modify the teachings of a reference is a question of fact. *WBIP, LLC v. Kohler Co.*, No. 15-1038, 2016 WL 3902668, at *4 (Fed. Cir. July 19, 2016). In reaching its verdict that the '398 patent was not obvious, the jury implicitly found that such a person would *not* have been motivated to combine the prior art references. But the only evidence in the record to support that finding is the conclusory testimony by plaintiffs' expert. The court concludes that this implicit finding is not supported by substantial evidence.

There was ample evidence that one of skill in the art would have been motivated to combine the use of echo cancellation in the one-line CapTel trials with the two-line configuration of the '685 publication to achieve functional equivalence. The modest design modification required—locating the echo cancellation mechanism in the captioned telephone itself—is well within the capabilities of one of skill in the art of telecommunications for the deaf and hard-of-hearing. Despite the jury verdict, defendants here make a compelling prima facie case of obviousness.

### d. Secondary considerations of non-obviousness

As a guard against the error of hindsight bias, the court must also consider any "objective indicia of non-obviousness," also known as secondary considerations. *WBIP*, 2016 WL 3902668, at *5 ("[E]vidence of secondary considerations may often be the most probative and cogent evidence in the record." (quoting *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983))). When an invention seems obvious in hindsight, these secondary considerations can provide objective evidence that those in the field of the art—at the time of the invention—could not have readily derived the invention from the teachings of the prior art. Secondary considerations include: copying by others; long-felt but unmet need;

commercial success; and praise by others. But each putative secondary consideration must be closely tied to the merits of the claimed invention and not to extraneous factors, such as effective marketing by the patent owner. At trial, plaintiffs offered evidence of each of these secondary considerations; defendants contend that plaintiffs failed to show the required nexus to the invention.

To demonstrate that defendants copied the invention, plaintiffs presented testimony and exhibits showing that defendants had access to the patent application, which described the patented method. Dkt. 519-7 and Dkt. 519-8 (listing patent application 20050226394 for captioned telephone service, which became the '398 patent). Plaintiffs also showed that defendants bought a model of the telephone and had it torn down by the same design firm that developed defendants' infringing product. Dkt. 631-32, at 10-12. The teardown of the physical telephone would not necessarily be informative about the software on the digital signal processor serving as the echo canceller. And "a showing of copying is only equivocal evidence of non-obviousness in the absence of more compelling objective indicia of other secondary considerations." *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1380 (Fed. Cir. 2000).

Plaintiffs presented testimony purporting to demonstrate the long-felt, unresolved need in the hard-of hearing community for the invention. Brenda Battat, former executive director of the Hearing Loss Association of America, testified that in the deaf and hard-of-hearing community there was a long-felt need for a functionally equivalent telephone service. She also testified that plaintiffs' two-line service with echo cancellation came closer to meeting that need than had previous versions of captioned telephone service. Dkt. 585, Tr. 5a, at 151:9-152:6. Battat explained the benefits of echo cancellation and two-line

10

services. *Id.* at 157:21-158:11. But nothing in Battat's testimony suggested that the '398 patent did anything more than combine the individual benefits of echo cancellation with a two-line captioned telephone in a way that would have been entirely predictable. And she did not offer any testimony that the last step of combining the features was in any way long-delayed or difficult.

Plaintiffs presented evidence of commercial success and licensing. Nexus to the invention is particularly important here, because "[c]ommercial success . . . may be linked to an individual element or, in other circumstances, it could be linked to the inventive combination of known elements." *WBIP*, 2016 WL 3902668, at *8. Plaintiffs failed to demonstrate how their commercial success and licensing was attributable to the invention of the '398 patent.

Robert Engelke testified that plaintiffs' two-line service was successful based on the number of phones sold and the number of minutes billed. Dkt. 583, Tr. 3p, at 66:9-68:7. Plaintiffs' evidence showed that their two-line phone was more successful than their one-line phone, but this evidence does not show that the commercial success was attributable to the new combination. Besides, a new product the combines the desirable features from prior art in a predictable way might well seem better than its inferior predecessors. Such sales alone do not demonstrate non-obviousness.

Engelke also testified that the '398 patent had been licensed to large telephone service providers including AT&T, Sprint, and Hamilton. Dkt. 583, Tr. 3p, at 58:9-61:2; Dkt. 631-6; Dkt. 631-7. But these licenses were to plaintiffs' patent portfolio, and so they do not demonstrate any special interest in the '398 patent. The evidence shows, in fact, that licensors do not even know about the invention. Dkt. 583, Tr. 3p, at 58:22-61:2 (Engelke

11

explaining that he "never discussed the '398 particularly with anybody" and did not "believe that anybody on [his] staff" had explained the patent or "all the stuff in it" to the licensees). Plaintiffs have an impressive patent portfolio, but licensing that portfolio tells the court little about the perceived importance of the '398 patent.

Plaintiffs also presented evidence of praise for their products and services. But the praise cited the benefits that derive from the two-line configuration or the use of echo cancellation. *See, e.g.*, Dkt. 608-5 and Dkt. 608-7. In other words, the praise was for attributes of the products that already existed in the prior art. For example, the use of an echo canceller to cancel the voice of the assisted user was in the CapTel trials. Accordingly, praising that use of echo cancellation does not necessarily support the non-obviousness of the '398 patent. *S. Ala. Med. Sci. Found. v. Gnosis S.P.A.*, 808 F.3d 823, 827 (Fed. Cir. 2015) (praise for an element already known in the prior art fails to support the non-obviousness of novel elements of the patent-in-suit).

Because the jury found that the patent was not invalid, the jury implicitly found that there were secondary considerations of non-obviousness. The court will consider this finding to be supported by substantial evidence.

But this implicit finding will not carry much weight when it comes to the legal conclusion of obviousness. Plaintiffs' evidence of secondary considerations was very weakly tied to the invention of the '398 patent. There is no objective evidence that would significantly undermine the strong prima facie that claim 11 of the '398 patent merely combines known elements in the prior art to achieve a predictable result. The combination of the teaching of the CapTel trials with the two-line configuration of the '685 publication

required a minimum of ordinary engineering work to locate the echo cancellation mechanism in the captioned telephone. The result was successful, but predictably so.

The court will grant defendants' motion for judgment as a matter of law that claims 11, 12, and 13 are invalid as obvious.[3]

### 2. Damages

Defendants challenge the jury's $5,443,484.61 damages award as unsupported by the evidence. Dkt. 605. This issue might be regarded as moot, given the court's decision that the patent is invalid. But it will come back into play if the court of appeals reverses the decision on validity. The matter has been fully presented, and the court can decide it now, to avoid some of the potential for piecemeal appeals.

Plaintiffs bear the burden of proving their damages, *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009), which, in this case, came in the form of a running royalty. "In a standard running royalty license, the amount of money payable by the licensee to the patentee is tied directly to how often the licensed invention is later used or incorporated into products by the licensee." *Id.* at 1326. "A jury's decision with respect to an award of damages 'must be upheld unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork.'" *Id.* at 1310 (quoting *State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1072 (Fed. Cir. 2003)).

---

[3] Claim 12 adds an additional limitation relating to the type of telephone line used. '398 patent, 12:10-14. Claim 13 adds the limitation that the telephone of the assisted user and the captioned telephone device are built into a single device. '398 patent, 12:15-17. These limitations are in the prior art, and plaintiff has not separately defended the validity of claims 12 and 13.

The jury came to its per-minute running royalty amount by first finding the royalty rate (three cents), then finding the total number of infringing minutes (181,449,487 minutes), and finally, by multiplying them. Dkt. 575. Defendants contest the jury's finding of total infringing minutes in this calculation.

On the eve of trial, defendants stipulated to at least one infringing call as the court defined it in this case.[4] Dkt. 602, at 3:11-4:20. So the extent of infringement arose only in the damages phase of trial. The parties agree that not all of the 206,192,599 minutes of service that defendants have provided since 2011 infringe the '398 patent because on some number of those calls, the voice of the assisted user was audible to the relay. The extent of infringement was somewhere between one minute and 206,192,598 minutes of calls. Defendants contend that the jury did not hear reliable evidence concerning the number of infringing minutes.

Ludwick testified for plaintiffs that he observed and recorded approximately 60 calls of various lengths over two days, in two different years, received by five call assistants at two of defendants' eight call centers. Dkt. 600, Tr. 7, at 79:6-93:23. Plaintiffs played three of the calls for the jury. *Id.* at 86:10-93:16. For seven of the calls, Ludwick testified that he heard the voice of the assisted user, meaning that those calls did *not* infringe the '398 patent. *Id.* at 89:8-93:23. Ludwick could not make a definitive determination about nine more calls that included automated messages, *id.* at 124:21-128:5, and he did not offer an opinion about the remaining 44 calls. In closing, plaintiffs argued that 53 calls out of the 60 calls, or 88 percent

---

[4] The court instructed the jury that the voice of the assisted user is cancelled, "so long as a call assistant with normal hearing would not hear the words spoken by the assisted user while captioning a call." Dkt. 567, at 8.

of the calls, infringed. The jury appeared to accept this argument, finding exactly the damages figure that plaintiffs suggested in their closing argument.

Plaintiffs refer to Ludwick's analysis of the approximately 60 calls as a "random sample." Dkt. 622, at 16. Perhaps the sample was random in the everyday sense of the word because Ludwick heard whichever calls happened while he was at the call centers. But the 60 calls were not a scientifically selected random sample of the 50 million calls that defendants received and captioned over four years. *See United Parcel Serv., Inc. v. U.S. Postal Serv.*, 184 F.3d 827, 840 n.14 (D.C. Cir. 1999) ("The validity of a survey's results is undermined if the sample is not representative of the population that it purports to represent or is not selected in a sufficiently random manner."). Ludwick's sample size is also awfully small, which raises a second concern about whether it is representative. *See, e.g.*, *Vista Food Exch., Inc. v. Vistar Corp.*, No. 03-cv-5203, 2005 WL 2371958, at *7 (E.D.N.Y. Sept. 27, 2005) (collecting cases about the inadequacy of extrapolating from a small sample size). Ludwick also applies the percentage of infringing calls to the number of infringing minutes in the 50 million calls at issue. Dkt. 600, Tr. 7, at 123:16-20. Ludwick's 60-call study is certainly not a robust statistical analysis.

In many cases, such statistically flimsy sampling would doom a damages calculation. But there are special circumstances here that support the award. Plaintiffs contend that other evidence supports the jury's damages verdict, citing to defendants' representations to customers and regulators regarding their service, which demonstrate that defendants intended to cancel the voice of the assisted user, and that they told others that they did. Dkt. 622, at 30. But most important, under the circumstances of this case, it is hard to see how plaintiffs could have done much more than they did. Defendants did not have any statistical data on

the effectiveness of their voice cancellation. Dkt. 600, Tr. 7, at 148:23-149:11. Much of the infringement period had passed before the suit was filed. The law prohibited the routine recording of captioned calls, so first-hand inspection of defendants' on-going activities was the only realistic option. A larger sample size would have been better, but the court cannot say that the jury award was completely unsupported or based on mere speculation. Defendants give no reason to think that the award was grossly excessive or monstrous.

Defendants also criticize plaintiffs' damages expert, Bruce McFarlane. Defendants' arguments are essentially the same as those presented in their motion in limine, Dkt. 408, which the court considered and rejected before trial, Dkt. 503, at 20-23. Defendants' criticisms go the weight of McFarlane's testimony, and defendants had the opportunity to present these criticisms at trial.

Defendants' motion for judgment as matter of law or for a new trial on damages is denied.

**B. Plaintiffs' motions**

The court will grant plaintiffs' motion to seal portions of the transcript, Dkt. 616, which is unopposed. The court finds good cause to seal these portions to protect plaintiffs' commercially sensitive information.

The court will otherwise deny plaintiffs' post-trial motions because plaintiff is no longer the prevailing party. Should the court's decision on defendants' validity motion be reversed on appeal, the jury verdict can be re-instated and plaintiff may renew its motions. There would be little to be gained by making provisional decisions on plaintiffs' motions at this time.

ORDER

IT IS ORDERED that:

1. Defendants Sorenson Communications, Inc. and CaptionCall, LLC's motion for judgment as a matter of law and for a new trial on damages, Dkt. 605, is DENIED.

2. Defendants' motion for judgment as a matter of law on invalidity, Dkt. 606, is GRANTED; defendants' motion for a new trial is DENIED.

3. Plaintiffs Ultratec, Inc. and CapTel, Inc.'s motion for a limited permanent injunction or an enhanced ongoing royalty, Dkt. 609, is DENIED.

4. Plaintiffs' motion to alter or amend judgment, Dkt. 612, is DENIED.

5. Plaintiffs' motion to seal portions of the trial transcript, Dkt. 616, is GRANTED.

6. Plaintiffs' motion for bill of costs, Dkt. 591, is DENIED.

Entered September 30, 2016.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge